In the Matter of ALEXANDER HAMILTON, Petitioner, against ROBERT MOSES, as Commissioner of Parks of the City of New York, Respondent.

Supreme Court, Special Term, New York County, December 10, 1948.

*Saxe, Bacon & O'Shea* (*Frederick vP. Bryan* and *Edward F. L. Bruen* of counsel), for petitioner.

*John P. McGrath, Corporation Counsel* (*William S. Lebwohl, Helen R. Cassidy* and *William E. Walsh* of counsel), for respondent.

NULL, J.  By this proceeding, the petitioner seeks to restrain the respondent, as commissioner of parks, from demolishing the structure known as Fort Clinton or Castle Clinton, unless he first procure the formal approval of the art commission of the city of New York.

In support of the application, the petitioner has presented a comprehensive background and history of Fort Clinton, including the details of its construction and the varied purposes to which it was devoted throughout the years.  It is pointed out that its construction was commenced in 1807 and completed in 1811.  It was named for DeWitt Clinton, Mayor of the city, and later Governor of New York.  It was one of three forts constructed for the defense of the City of New York.  Its structural architect was John McComb, Jr., one of the most distinguished architects of his time who, also, designed New York's City Hall.  Built on a ridge of rock off the southerly tip of Manhattan, the fort became situate, subsequently, on the green known as Battery Park, when ground fill extended the shore of Manhattan Island.

Fort Clinton played an honorable part in the defense of the New York area during the War of 1812.  It served as regional headquarters for the United States Army, and naval warships were fitted out in New York harbor under the protection of its guns to sail away to meet the enemy.  It is authoritatively stated that its cannon helped to deter an enemy assault upon the City of New York in 1814 and the city was spared the fate of the national capital in that war.  The petitioner has made mention of many other notable incidents to illustrate the historical significance of the fort.  I do not think it can be questioned that from within the walls of Fort Clinton came many of the distinguished figures and events of that epoch.

After the War of 1812, when harbor defenses were shifted to the outer bay of New York and the United States Army moved

its headquarters to Governor's Island, Fort Clinton was turned over to the City of New York. Renamed Castle Garden, the fort was used from 1823 to 1855 for public assemblies and entertainments. During that period a roof was added to the structure. We are reminded by the petitioner that Castle Garden was the scene of the reception to Lafayette in 1826, to Louis Kossuth, the Hungarian patriot, to the then Prince of Wales and to every President of the United States from Jackson to Pierce; that Webster and Clay addressed audiences there and Jenny Lind, the '' Swedish Nightingale '' there made her American debut in opera. After 1855 to the end of the nineteenth century, Castle Garden served as a center through which passed many millions of immigrants.

Thereafter, a superstructure and interior structures were added to the walls of the old fort and it became the Aquarium. In 1941, the Aquarium was discontinued and the superstructure and interior structure were demolished.

The petitioner asserts that the demolition of the Aquarium has left the original walls of Fort Clinton intact and in reasonably good repair; that the structure is one of the few remaining examples of the military architecture of the last century; that it is of great historical, cultural and sentimental significance. Accordingly, the petitioner contends that the structure is a work of art, a '' monument '' or '' walls '' within the purview of section 854 of chapter 37 of the New York City Charter, the demolition of which is subject to the written approval of the art commission.

The art commission is a municipal agency authorized under chapter 37 of the New York City Charter. By the terms of the statute, the members of the art commission are the Mayor, the president of the Metropolitan Museum of Art, the president of the New York Public Library, the president of the Brooklyn Institute of Arts and Sciences, one painter, one sculptor, one architect and one landscape architect, and three other persons not professionally associated with the fine arts. The latter seven members, however, are required to be appointed by the Mayor from a list submitted by the Fine Arts Federation of New York.

The jurisdiction of the commission extends to objects of art owned or to be acquired by the city (New York City Charter, § 854). Particularly pertinent to the controversy at bar are the provisions of subdivision f of section 854. Broad in scope, they require the commission to '' periodically examine all monuments, sculpture and paintings belonging to the city '' and to

'' make or approve detailed recommendations for their cleaning, maintenance and repair ''.  It is provided that the commission '' shall have general supervision over such monuments, sculpture and paintings and their cleaning, maintenance and repair.  No cleaning, restoration, repair, alteration, removal or relocation of any work of art shall be contracted for, commenced or prosecuted, unless approved in writing by the commission.''  The term '' work of art '' is defined by subdivision a of section 854 to include '' all sculptures, paintings, mural decorations, mosaics, stained glass, statutes, carvings or castings in high or low relief, inscriptions, monuments, fountains, arches, walls, curbings, steps, gates, fences, benches, lamps or traffic signals, erected or to be erected upon or over land belonging to the city,   *   *   *   and whether intended for ornament, commemoration or actual use.''

Accepting, as I must, the statutory definition of a '' work of art '', the question is whether Fort Clinton or Castle Clinton is a '' monument '' or '' walls '' subject to the supervision of the art commission to the extent prescribed by law.

As to that, the undisputed facts may be summarized as follows:

(1) On May 9, 1946, the Secretary of the Interior requested a recession of Castle Clinton to the United States '' for the purpose of establishing it as a national monument.''

(2) Thereafter, the Congress of the United States by chapter 954, Public Law 721, of the laws of the United States (60 U. S. Stat. 997), authorized the acceptance of title to Castle Clinton and enacted that '' When title. to such property is vested in the United States, it shall constitute the Castle Clinton National Monument.''

(3) On August 12, 1946, this enactment was approved by the President.

(4) On April 1, 1947, the Under Secretary of the Interior, in order to prevent its then contemplated demolition, undertook to accept a conditional offer of the title to Castle Clinton.  His letter to the Mayor of the City of New York concluded:  '' I shall appreciate your careful consideration of this proposal before a final decision is made on the proposed demolition of a landmark which Congress has voted to be of national importance.''

(5) On August 1, 1947, the Secretary of the Interior, in his letter to the Mayor of the City of New York, stated:  '' I would like to ask you, in the interest of cooperation between New York

City and this Department, to place these facts before the Board of Estimate with a recommendation that the recent action to demolish Castle Clinton be reconsidered, and the famous landmark, which Congress has recognized to be of national importance, be permanently preserved ''.

(6) Subsequently, the board of estimate rescinded its resolutions to demolish Castle Clinton, and the Mayor of the City of New York called upon the city council to join in a request to the State Legislature for an amendment of the Administrative Code which would authorize the cession of Castle Clinton to the United States '' for the purpose of the establishment and preservation of a national monument to be known as ' Castle Clinton National Monument ' ''.

(7) On March 11, 1948, the city council unanimously passed a resolution concurring in the request of the Mayor to the State Legislature.

(8) The Mayor of the City of New York promptly forwarded to the State Legislature this request as approved by the city council.

(9) On March 12, 1948, an act in compliance with the Mayor's message was unanimously approved by the Senate.

It should be noted that the act was not reported out by the rules committee of the Assembly, and the Assembly took no action on the subject. The Legislature adjourned on March 13, 1948.

The factual record of the action taken and the views expressed by public bodies and officers attest in unmistakable terms that the preservation of Castle Clinton is no mere fad or whimsy of the misguided or sentimental. The petition and the accompanying papers set forth the deep concern of many distinguished citizens and organizations devoted to safeguarding historic and architectural landmarks. Had the Assembly of the State of New York, as the Senate had done, concurred in the enactment requested by the Mayor of the City of New York, Castle Clinton would have taken its place among the national monuments of the country.

Despite those compelling circumstances, which are not denied, the respondent, nevertheless, urges that the old fort may not be regarded as a monument because it was not erected to commemorate some subject or event. Obviously, a concept so narrow would exclude most national monuments as well as the treasured relics and remains of the past. Presumably, this construction would limit the term '' monument '' to shafts,

statuary, plaques and the like, if erected and dedicated to com-
memorate some person or event. If this be true, only the
symbol rather than the substance would seem to be worthy of
preservation. This position is contrary to that taken by the
appropriate city authorities when they joined in urging upon
the State Legislature the cession of Castle Clinton to the United
States. Clearly, there is no such limitation upon the art com-
mission which, by the city charter, is entrusted with the super-
vision of all works of art defined in subdivision a of section 854
to include " walls " and whether " intended for ornament, com-
memoration or actual use." There is, moreover, the evidence
that the fort structure and its walls constitute an example of
unique architecture. Fort Clinton is one of the four structures
symbolic of early New York which still stand in lower Man-
hattan, the others being St. Paul's Chapel, Fraunces Tavern
and City Hall. Independent of all other considerations, the evi-
dence establishes that the fort has intrinsic value as a work
of art.

The disinterested comment of the Department of the Interior
of the United States as well as the photographs submitted on
this application fail to bear out the respondent's observation
that the structure is in ruins. The Under Secretary of the
Interior on April 1, 1947, wrote: " Our architects, in making
their examination, find the body of the structure, with its walls
of 9 feet thickness and over 600 feet of circumference quite
intact. These original walls stand securely beneath the rem-
nants of the Aquarium super-structure, which, we are advised,
could be removed and readily repaired with very little effort."

It is argued that the approval of the art commission as
required by section 854 applies only to " cleaning, restoration,
repair, alteration, removal or relocation " (subd. f), and that
this language does not include demolition. I think that this rea-
soning distorts the true meaning of the statute and does vio-
lence to the purposes for which the art commission was estab-
lished. It is utter sophistry to say that the art commission may
prevent the board of estimate from " cleaning " or " altering "
or " removing " a valuable work of art, but is helpless to pre-
vent its utter destruction. Once a structure is established as a
work of art or here, as a monument, it is clear that its disposi-
tion is subject to the approval of the art commission.

The plain intent of chapter 37 is to vest in the art commission,
composed, as it is required to be, of persons having the highest
qualifications for that purpose, the general authority to pass

upon the aesthetic phases of the municipal function. In that connection, it is also provided, that no work of art may be acquired by the City of New York by purchase or even gift nor erected or displayed in any public place or building without the approval of the art commission (New York City Charter, § 854, subd. a).

The expenditure of public funds, however, for the maintenance or restoration of public objects of art, any more than for their purchase, is another matter. The appropriation of moneys is for the board of estimate and not for the art commission. In the exercise of its functions upon the acquisition or disposition of works of art, the art commission in no way trespasses upon the powers of the board of estimate.

I have examined the records in both *Wetter* cases (*Matter of Wetter* v. *Moses,* N. Y. L. J., Nov. 18, 1941, p. 1548, col. 1; *Wetter* v. *Moses,* N. Y. L. J., Dec. 8, 1942, p. 1799, col. 7, affd. 265 App. Div. 993, appeal dismissed 290 N. Y. 761). Neither case is determinative of the issue involved in this proceeding. The first *Wetter* case (*supra*) concerned itself with the closing of the Aquarium. In the light of the construction work then proceeding in Battery Park, the court held that the fencing in of the entire park and the closing of the Aquarium were a proper exercise of administrative discretion. The second proceeding was based upon alleged fraudulent representations made by the park commissioner for the purpose of inducing the board of estimate to authorize the demolition of the Aquarium. Reference was made in that action of the failure of the respondent to comply with section 854 of the New York City Charter. In view of the nature of the section, that question was a collateral matter and could have played no part in the determination of the court. Even the answer to the amended complaint contained the statement that upon the determination by the board of estimate of the question of policy, the commissioner of parks would proceed to draw detailed plans for the reconstruction of Battery Park and " submit to the Art Commission and other municipal agencies those portions of the plans which are required to be submitted for their approval ". At that time, too, there was no showing of the universal acceptance of Castle Clinton as meriting dedication as a national monument. That occurred more than five years thereafter. The opinion of the court in the second *Wetter* case (*supra*) suggests that its determination was based upon documentary evidence and official records which established that the respondent had acted pursuant to authority of the board of

estimate. The court's decision merely confirmed the authority of the board of estimate to determine the question of policy. It did not authorize it to ignore the art commission with respect to those plans required by law to be submitted to it.

There is raised, too, the familiar conflict between the utilitarian and the artistic. It is asserted that the general plan for the reconstruction of Battery Park undertaken in connection with the building of a tunnel and its approaches makes it necessary to remove the fort structure. While this contention, even if valid, could hardly justify a violation of law, it is apparent that when cession of the fort to the Federal Government was contemplated, the continued existence of the structure at its present site was not considered the same insurmountable obstacle which, seemingly, it is presently claimed to be. Whatever may be said for the concept that the old must yield to the new, I think there is still room for values which, while they may fail to impress in a material sense, nevertheless make for a fuller national and community life. A people indifferent to the landmarks and monuments of its past will not long retain its capacity to achieve an honored future.

Upon all the circumstances, I am satisfied that Castle Clinton is a monument of significant historical and architectural value. Inasmuch as the Mayor of the City of New York and the city council reached the same conclusion as early as March, 1948, and urged that view upon the State Legislature, the contrary contention advanced here by the respondent, as commissioner of parks, is difficult to understand. I am constrained to hold that the denials in that connection are merely conventional; they raise no substantial issues of fact which require determination on a trial.

The application is granted. Settle order.